## THE PRESIDENT, MANAGERS AND COMPANY OF THE BALTIMORE AND FREDERICK TOWN TURNPIKE ROAD *vs.* THE UNITED RAILWAYS AND ELECTRIC CO. AND J. H. GAITHER.

*Electric Railway Authorized to Run Passenger Cars Only on a Turnpike Road is Not Entitled Under the Contract to Run Cars Carrying Express Matter and Freight.*

Plaintiff, a turnpike company, owning a macadamized roadway and charging tolls for its use, granted in 1861 to a passenger horse railway company the right to construct and operate a railway on the bed of the turnpike by a contract which provided that the railway might carry passengers and light packages such as are usually carried in passenger cars, but should not put on freight cars or carry heavy freight, and that no steam should be used in propelling the cars. In 1895 the turnpike company made a contract with an electric railway company, the successor in title of the horse railway company, authorizing it to use the turnpike for an electric passenger railway upon the same conditions as above mentioned "except that the cars of said electric railway shall always be permitted to carry such articles as are carried on other suburban electric railway lines running into Baltimore." Defendant company became the owner of said electric railway and began to run cars for the transportation of express packages and freight, which cars did not also carry passengers. *Held*,

1st. That the defendant is not entitled under these contracts to run freight or express cars over the turnpike road, or any cars other than those for passengers, with the privilege of carrying such light packages, as are incident to passenger travel, and that an injunction should be granted to restrain the operation of express or freight cars.

2nd. That the running of express cars by the defendant is not an injury for which the plaintiff can be compensated in equity.

The same turnpike company authorized the defendant company to use another part of its road-bed for an electric railroad "for the transportation of passengers and such bundles and parcels as are now customary to be carried on the city and suburban electric railway lines, but not for the transportation of heavy freights." *Held*, that since the evidence does not establish the existence of a custom to run express cars on suburban electric lines at the time the contract was made, the defendant has no right so to do under this grant.

Appeal from a decree of the Circuit Court No. 2, of Baltimore City (SHARP, J.)

The cause was argued before McSHERRY, C. J., PAGE, PEARCE, SCHMUCKER and JONES, JJ.

*John V. L. Findlay* (with whom was *Thos. Mackenzie* on the brief), for the appellant.

*George Dobbin Penniman* (with whom was *E. J. D. Cross* on the brief), for the apellee.

PEARCE, J., delivered the opinion of the Court.

The Baltimore and Fredericktown Turnpike Company was incorporated in 1805 for the purpose of constructing and operating a turnpike from the city of Baltimore to Boonsborough in Washington County, Maryland. The road was duly constructed and has ever since been in continuous operation between the termini named, and passes through Catonsville and Ellicott City. The United Railways and Electric Company is a corporation operating numerous consolidated *passenger* railways, one of which runs over a portion of the right of way of said Turnpike Company between Baltimore and Catonsville, and also over another portion of the same, beginning at Ellicott City on the west side of the Patapsco river and running thence westwardly about two miles. This is done under certain contracts which will be mentioned hereafter. A bill in equity was filed by the Turnpike Company against the Electric Railways Company and James H. Gaither to obtain an injunction re-

straining the defendants from running over the right of way of the plaintiff, freight cars, or cars adapted and used for the purpose of carrying freight only, as separate and distinct from the carriage of passengers, and from carrying any freight, except such light packages and such articles as are usually carried on *passenger* cars of other suburban electric railway lines running into Baltimore; and also to obtain a decree for payment by the defendants to the plaintiff of such sum of money as should be found necessary to indemnify the plaintiff for the loss of revenue by reason of the running such freight cars, in the conduct of an express business, over said turnpike by the said Gaither under authority of the United Railways and Electric Company.

Gaither failed to appear after being summoned, and a decree *pro confesso* was taken against him. The railway company answered, alleging a right to operate said express over said right of way under the contracts referred to, but denied that it carried heavy freight or any articles not allowed by said contracts and after hearing, upon testimony taken, a decree was passed dismissing the bill, from which decree this appeal was taken.

The right to operate said express business, and to carry the freights mentioned in the bill, over that part of the right of way between Baltimore and Ellicott City depends upon the construction to be given to two contracts; one between the Turnpike Company and the Baltimore, Catonsville and Ellicott's Mills Passenger *Railway* Company, made March 11th, 1861; and one between the Turnpike Company and the Baltimore, Catonsville and Ellicott's Mills Passenger *Railroad* Company, made June 18th, 1895. The last named company acquired all the rights of the one just before named, and the United Railways and Electric Company subsequently acquired all the rights of both the other companies, and Gaither operated said express business and ran said freight cars, under an arrangement with the United Railways and Electric Company.

Under the contract of March 11th, 1861, the Baltimore, Catonsville and Ellicott's Mills *Passenger* Railway Company,

which was incorporated to operate a *horse railway*, acquired from the Turnpike Company for a valuable consideration, the right to construct and operate its railway upon the bed of the turnpike between Baltimore and Ellicott's Mills, now Ellicott City, upon the terms and conditions stated in the contract. The conditions which are material to this case are contained in the seventh clause, which is in these words.   " The Passenger Railway Company may carry passengers *at their discretion,* and may also carry light packages, and such articles as are usually carried on passenger railway cars, but shall not put on freight cars, or carry heavy freight, *it being intended to limit the right of way to passenger railway cars.*"   By the eighth clause of this contract it was also provided that no steam should be used in propelling cars except with the consent of the Turnpike Company.

The horse railway contemplated by the agreement of March 11th, 1861, was constructed from Baltimore to Catonsville by the Baltimore, Catonsville and Ellicott's Mills Passenger *Railway* Company, and was operated under said agreement for many years, but it subsequently became insolvent, being unable to compete successfully with a rival *steam* road, known as the Catonsville Short Line, and it was purchased by a syndicate in the interest of the City and Suburban Railway Company, and was reorganized under the name of the Baltimore, Catonsville and Ellicott's Mills Passenger *Railroad* Company and was operated as a part of the City and Suburban Railway system.  With the development of electricity as a motive power, it became clear that horse railways could not be successfully operated, and the agreement of June 18th, 1895, heretofore mentioned, was made between the Turnpike Company and the Baltimore, Catonsville and Ellicott's Mills Passenger Railroad Company.   Under that agreement the last mentioned company acquired from the Turnpike Company the right of way over its turnpike for a *single* track electric railway with sidings, and for a double track over portion of said turnpike, between Baltimore and the terminus of the horse railway at Catonsville.   By the fourth clause of that agreement it was pro-

vided that "in constructing and maintaining said electric railway on the bed of said turnpike, the terms of the agreement dated March 11th, 1861, entered into between the Turnpike Company and the Baltimore, Catonsville and Ellicott's Mills Passenger Railway Company are to apply, except as the terms of said agreement are herein modified and explained." A comparison of these two agreements makes it plain that the clause just above quoted was introduced to ensure that there should be no impairment of the surface of the turnpike, and no diminution of the width of the turnpike in consequence of the construction of the electric railway, and that thus the same facilities should be afforded to all persons desiring to use the turnpike with their teams after, as were afforded before, the construction of any railway upon the bed of the turnpike.

By the seventh clause of this second agreement it was also provided that, "The terms of the seventh clause of the agreement of March 11th, 1861, shall apply to the use and operation of said electric railway, except that *the cars* of said electric railway shall always be permitted to carry such articles as are carried on other suburban electric railway lines running into Baltimore;" and by the eighth clause of the same agreement it was provided that, "The eighth, ninth, tenth and eleventh clauses of the agreement of March 11th, 1861, shall apply to the use and operation of said electric railway upon said turnpike." The eighth clause of the former agreement, as we have already seen, forbids the use of steam as a propelling power.

Subsequent to the making of this second agreement, the Baltimore, Catonsville and Ellicott's Mills Passenger Railroad Company was consolidated with certain other corporations operating street railways in Baltimore City and Baltimore County, which now constitute the United Railways and Electric Company, one of the defendants in this case.

Upon a careful considertion of these two contracts and of the testimony applicable there to, we have no difficulty as to the construction they should receive. The situation of the parties at the date of the contract of 1861 was this: The Turnpike

Company had constructed and was maintaining a metalled, or macadam, roadway for all classes of vehicles, whether used for pleasure or business, which it was enabled to maintain only by the tolls charged and received.   When the horse railroad was chartered as a passenger railroad, it was at once apparent that it must in large measure supersede public conveyances such as stage coaches and omnibuses for passenger travel and also reduce the number of private vehicles using the turnpike for business as distinguished from pleasure ; and this would be true whether the horse railroad paralleled the turnpike, or used its road-bed under some contract for that purpose.   Hence it was but common sense on the part of the Turnpike Company to sell to the Railroad Company the right of way over their road-bed for passenger travel, upon any terms that might be deemed adequate.   But the horse railroad, while offering superior inducements for passenger travel, could not materially affect the carriage of merchandise or freight of any description, and the Turnpike Company could still rely upon that source of revenue without sensible impairment, and the horse railroad company had no reason to desire the right of way over the turnpike for any purpose other than the carriage of passengers, and of such articles as passengers were in the habit of carrying with them in other vehicles, usually without additional charge and as incidental to passenger travel.   Keeping in view the situation of the respective parties, it is apparent from the terms of the contract that the subject of sale on the one hand, and of purchase on the other hand, was simply the right of way for passenger travel.   Its exact language was, "The Passenger Railway may carry *passengers at its discretion,* and may also carry *light packages and such articles as are usually carried on passenger railway cars,* but shall not put on freight cars, or carry heavy freight, it being intended to limit the right of way to passenger railway cars ;" And further, "No steam shall be used in propelling cars except with the consent of the Turnpike Company."

In the days of stage coaches and omnibuses, passengers carried light packages and articles of personal use and conven-

ience, and this practice prevailed also on passenger railway cars. Hence the Railway Company stipulated for this privilege. No doubt it was more largely availed of upon passenger railway cars by reason of the greater space, and the lighter draft over iron rails, but the privilege was still for such light packages and articles only as were incident to passenger travel, and as the travelling public would tolerate upon passenger cars. Not only were freight cars forbidden on the right of way, and the carriage of heavy freight in any manner, but the right of way expressly limited to passenger railway cars.

No contention appears to have arisen under this contract, though the parties operated under it until 1895, when electricity had become established as a motive power, but freight cars had not been introduced upon passenger railway lines. In the meantime there had been no change in the situation of the parties. The Turnpike Company was still receiving patronage for hauling and for driving for pleasure as well as for such business purposes as were not better served by the Railroad Company ; and the latter was still soliciting patronage for rapid transit of passengers. The same considerations which operated with the Turnpike Company in 1861 to sell the right of way for passenger travel to the horse railroad company, operated with it in 1895 to sell the same right to the Electric Railway, and the same reasons which led to the reservations and restrictions of the contract of 1861 led with equal force to the same reservations and restrictions in the contract of 1895. If such reservations and restrictions had not then been made, it must now be apparent the Turnpike Company might as well have gone out of business. But the contract of 1895 expressly provided that in the construction and maintenance of the Electric Railroad, the terms of the agreement of 1861 should apply, except as said terms were modified in the latter contract, and that the seventh clause of the agreement of 1861 should also apply " except that the cars of the said electric railway shall always be permitted to carry such articles as are carried on other suburban electric railway lines running into Baltimore. " This clause and the seventh clause of the

contract of 1861 must be construed together so as to give effect to both, and to any enlargement of the privileges conferred by the latter, the only enlargement suggested being such as might be found in the articles carried on ordinary passenger railway cars, and on those of electric railway passenger cars. The contract of 1861 limited the right of way to passenger and expressly excluded freight cars, or heavy freight. The " *cars* " of the electric railway, spoken of in the agreement of 1895 as permitted always to carry such articles as are carried on other suburban electric railway lines running into Baltimore, are therefore, *such* cars, and such *only*, as are permitted by the agreement of 1861, which is made part of the agreement of 1895, that is, *passenger* railway cars, and *not* freight cars ; and the articles which are permitted by that agreement to be carried in the cars permitted to be used, are such articles as are carried in the passenger cars of other electric lines running into Baltimore, and not such as are carried in the freight cars of such other lines, if freight cars should have been in use on such lines. If the Electric Railway Company had contemplated the use of freight cars, and the carriage of general freights they should have provided for it clearly in their agreement. They have not only not done this, but they have employed language, which in our judgment, forbids the use of an express car carrying general freight, not carrying passengers, and not adapted or designed or offered to the public for such use.

It was contended for the appellee in the brief that there was no evidence of the running of an express car, or the carriage of any express matter or general freight, over the right of way granted under the contract of 1895, and that therefore there could be no injunction granted as to that part of the line ; but Mr. Dorsey's testimony is positive that he had frequently seen the car fitted up as a freight car and used in running the express, and that he had seen *all kinds of freight go in and out at Catonsville*, which is on that part of the line operated under the agreement of 1895 ; that only the day before he was testifying, he saw that car on the road carrying

a large lot of three or four-inch iron pipe. This was uncontradicted and conclusively establishes the use of the express car carrying general freight over that part of the line.

It was further contended for the appellee that the articles which it was testified were carried in the freight, or express car, do not come within the designation of "heavy freight," and for this, reliance was placed upon the testimony of Mr. Spring, general agent of the United States Express Company, carried over the Baltimore and Ohio Railroad, who testified that such articles as lots of cement in barrels, flour and whiskey in barrel lots, rolls of wire-fencing one hundred pounds to the roll, ice by the ton, lumber, land plaster in bag lots, as high as a hundred bags in a lot, iron piping, dressed hogs, &c., were not "heavy freights" in the trade sense of the term; no matter what the weight or number of such articles, unless shipped in carload lots. Assuming this to be correct as applied to the business of steam railroads, and we must so assume in the absence of other testimony upon this point, it must be remembered that these contracts expressly prohibit the use of steam in propelling the cars permitted to be run over the right of way, and we think the sufficient answer to the adoption of the meaning to be assigned to this term upon the testimony of Mr. Spring, is, that this technical meaning is not shown to be applicable to any other business than that of steam railroads, and that the term "heavy freights" as used in these contracts, with reference to the business of passenger horse cars and passenger electric railway cars, can by no fair implication be supposed to have been used in the technical sense employed in the business of a steam railroad, whose mode of propulsion, at that time thought to be essential for the transportation of railroad freight as a business, was excluded by these contracts. We are sustained in this view by the opinion of CHIEF JUSTICE GIBSON in *Schuylkill Navigation Co.* v. *Moore,* 2 Wharton, 491. In that case, the plaintiff, an incorporated company, authorized to use and grant the water-power of the Schuylkill river for mannfacturing purposes granted to the defendant the right to draw so much water as

could pass through two metallic apertures of prescribed size. The defendant without increasing the size of the apertures, applied to them a conical tube called an ajutage which enlarged the flow of water, and suit was brought to recover damages for the excess of water so drawn. It appeared that this device was known to those skilled in hydraulics and to some ot the officers of the Navigation Company before the making ot the contract, but it was held that the true construction of the contract was, that the water was to be delivered in the ordinary way and that the defendant had no right to increase the flow by means of an ajutage. The Judge said: "The best construction is that which is made by viewing the subject of the contract, as the mass of mankind would view it; for it may be safely assumed that such was the aspect in which the parties themselves viewed it. *A result thus obtained, is exactly what is obtained from the cardinal rule of intention.* It is ot convincing importance that the improvement, so to speak, can benefit the owner of it, only by being applied to gain an advantage from a contract which would not have been made, had the purpose subsequently attempted to be accomplished by it been suspected."

We think that the Turnpike Company is entitled to an injunction to restrain the running of a freight or express car, or of any other cars than those for passengers over that portion of its road between Baltimore and Ellicott City, or the carrying over that part of its road in any cars of any articles except such as are carried in the passenger cars of other electric lines running into Baltimore.

We now come to the contract of March, 1899, which applies only to that part of the turnpike which lies west of the Patapsco river. The Electric Railway Line which uses this part of the turnpike comes out of Baltimore on the Edmondson avenue line, and first touches the turnpike at Ellicott City, running thence westwardly for two miles. As to this portion of the line the proof is abundant that all the articles we have mentioned heretofore are constantly carried over the road into Ellicott City, and that before the establishment of Gaither's

Electric Express these articles were carried to Ellicott City both by Gaither's Express wagons, of which he had eight or ten in daily use over the turnpike, or by the United States Express Company over the B. & O. R. Co.

The contract of March, 1899, was made with the United Electric Railways Company directly. It does not anywhere refer to either of the preceding contracts and they cannot, therefore, be allowed to control the construction of the latter. It gives the right to construct and maintain upon the centre of the turnpike for two miles westwardly from the Patapsco river a double-track railway, with the right to operate the same "by electricity or other improved motive power, *not, however, by the use of steam; for the transportation of passengers* and such bundles and parcels as are now customary to be carried on the City and Suburban Electric Railway Lines, *but not for the transportation of heavy freights.*" There is no express restriction here to the use of passenger cars, but with this exception, the same limitations and restrictions substantially are made as in the preceding contracts, and the same general purpose is discovered. The provision for the transportation of passengers and of bundles and parcels is made in the same clause, in a single sentence and without any indication, not even a comma, of separating the carriage of passengers from the carriage of bundles and parcels, as personal belongings of such passengers. The contract also makes careful provision for restoring the surface of the turnpike displaced alongside of the tracks in their construction and for widening the turnpike with macadam for eight feet on each side of the tracks so as to retain its former width "fit for travel of all kinds and for the transportation of light as well as heavy produce," and for maintenance of the same grades after, as before, the construction of the electric road, thus indicating the purpose of the turnpike company to exercise all its franchises and to solicit the same public patronage as before.

It is shown by the testimony of Mr. Russell and Mr. Chalk, who were agents of the Baltimore and Northern Electric Railroad, at Reisterstown and Mount Washington, that about Oc-

tober, 1898, that line began to run a car designed for freight between Baltimore and Reisterstown, and that such articles as we have mentioned were carried in that car, but there is no evidence that any other electric line running into Baltimore ran such a car before March, 1899, and Mr. Dorsey, who had been the superintendent of the Turnpike Company for fifty years, whose summer home is in Greenspring Valley and who sometimes passes over the Reisterstown pike, says that he never saw one of these express cars and never heard until the year 1900 that any express or freight business was done over any electric line running into Baltimore.

The language of this contract is—"as are now customary to be carried over the City and Suburban Electric Railway Lines." We think this must be taken to mean a general custom among such electric lines. No such general custom has been established by any evidence and no knowledge of the running of such a car by the single line mentioned at the date of the contract has been brought home to the Turnpike Company, and we think that the contract of 1899 must receive the same construction as the two former contracts.

The running of the express car not being under any contract is a mere trespass for which the plaintiff cannot be compensated in equity.

But for the reasons stated the decree appealed from must be reversed and the cause be remanded that a decree may be passed in conformity with the views we have expressed.

> *Decree reversed and cause remanded for further proceedings, with costs to appellant above and below.*

(Decided March 7th, 1901.)